UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:21-cr-00010-MMD-CLB-1 |
| Plaintiff, | ORDER |
| v. | |
| JAIME COLLAZO MUNOZ, | |
| Defendant. | |

## I.    SUMMARY

Jaime Collazo Munoz was indicted on four counts of distribution of a controlled substance. (ECF No. 1.) These charges are based on the government's theory that Munoz sold fentanyl to a DEA confidential source and an undercover agent on four occasions. (ECF No. 85 at 1-2.) Munoz now moves to dismiss the indictment ("Motion") in its entirety, arguing that the underlying investigation constituted outrageous government conduct and violated his Fifth Amendment rights.[1] (ECF No. 69 (Sealed).) The Court denied the Motion in a minute order. (ECF No. 101.) This is the written order with the Court's reasoning for the denial. As further explained below, the Court denies the Motion because Munoz failed to meet the "extremely high standard" for dismissal on the grounds of outrageous government conduct.

## II.    FACTUAL BACKGROUND[2]

In May 2020, the U.S. Drug Enforcement Administration ("DEA") began investigating Munoz after a Source of Information ("SOI") identified him as a distributor of counterfeit oxycodone M30 pills and cocaine and alleged that Munoz possessed up to

---

[1]The government filed a response (ECF No. 85 (Sealed)) and Munoz filed a reply (ECF No. 97 (Sealed)) to the Motion.

[2]*See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").

6,000 M30 pills at one time. (ECF Nos. 69 at 4, 85 at 2, 86-1 at 1.) The SOI also revealed that Munoz conducted drug transactions at his barbershop, Stay Faded. (*Id*.) The SOI eventually became a DEA Confidential Source (CS-1) around June 3, 2020. (ECF Nos. 69 at 4, 85 at 2, 86-1 at 3.)

On June 3, 2020, DEA arranged for a first meeting between Munoz, CS-1, and an undercover DEA officer (UC-1) at a restaurant, so CS-1 can pay Munoz a $5,300 debt. (ECF Nos. 69 at 5, 85 at 3, 86-9 at 1.) The government maintains that this was a drug debt, which Munoz disputes. (ECF Nos. 69 at 5, 85 at 3.) The interaction was recorded[3] and monitored by DEA agents. (ECF Nos. 69 at 5, 85 at 4.) CS-1 introduced UC-1 to Munoz as his cousin, and they discussed CS-1's forthcoming rehab stay. (ECF Nos. 85 at 4, 86-10.) At the end of the meeting, UC-1 observed Munoz taking the $5,300 cash that CS-1 placed under a napkin near him. (ECF Nos. 85 at 4, 86-9, 86-10.)

DEA arranged for a second meeting between CS-1 and Munoz at his barbershop on July 21, 2020. (ECF Nos. 69 at 7-8, 85 at 5.) This interaction was recorded. (*Id*.) CS-1 informed Munoz that he knows a buyer (UC-2) who is interested in purchasing pills from Munoz and asked whether Munoz can get him 200, possibly 500, pills. (ECF Nos. 85 at 5, 86-12.) Munoz responded that he could get "whatever he wants" as long as the buyer had money.[4] (*Id*.) CS-1 then discusses pricing per pill with Munoz and how the profit would be split. (ECF Nos. 85 at 6, 86-12.) Text messages between Munoz and CS-1 seemingly confirm this exchange. (ECF No. 86-13 at 5.)

The charges in this case are based on four subsequent purchases of fentanyl from Munoz. (ECF No. 1.) On July 24, 2020, Munoz met with CS-1 and UC-2 at his barbershop,

---

[3]The audio/video recordings and text messages are attached as exhibits to the government's response and presumably provided to defense counsel in discovery. (ECF No. 86 (Sealed).)

[4]Although Munoz correctly notes that the audio clip of this interaction contains background music and Munoz's voice is muffled at times, a careful review of the recording supports that Munoz responded he could get the pills for CS-1 if the buyer had money. (ECF No. 86-12.) Munoz also appears to reply "yeah" in response to CS-1's proposals regarding the pricing of the pills and how the profits would be split amongst the two of them. (*Id*.) Moreover, as noted above, the details of this interaction are partially supported by text messages between the parties. (ECF No. 86-13.)

1    where he allegedly provided them with 400 pills in exchange for $6,000. (ECF Nos. 85 at

2    6-7, 86-9 at 16-17, 86-14.) UC-2 reports that Munoz asked if he was there to buy fentanyl,

3    gave a pill to UC-2 to inspect, and returned with the pills that UC-2 wanted to purchase.

4    (ECF Nos. 69 at 10, 86-9 at 16-17.) On a recorded phone call on July 27, 2020, Munoz

5    voluntarily asked if CS-1 needed "any more of those things," to which CS-1 responded he

6    wanted 100-200 of the fentanyl not the Percocet, and Munoz replied "yeah, we will do

7    that tomorrow." (ECF Nos. 85 at 7, 86-15.) In an audio message on July 30, 2020, Munoz

8    appears to say that he should be getting more pills in a few days.[5] (ECF No. 86-16.) CS-

9    1 and Munoz then met again on August 4, 2020, where Munoz allegedly provided CS-1

10   with around 80 pills in exchange for $1,100. (ECF Nos. 85 at 8, 86-18.) In the recording,

11   Munoz and CS-1 discuss the total price and split of the purchase, where Munoz appears

12   to correct CS-1's calculations. (ECF No. 86-18.) On August 6, 2020, CS-1 called Munoz

13   and asked if he can pick up the remaining pills, to which Munoz agreed. (ECF Nos. 85 at

14   9, 86-19). The parties later met at a restaurant, and they go to another location, where

15   Munoz allegedly provided CS-1 with around 100 fentanyl pills in exchange for money.

16   (ECF Nos. 85 at 9, 86-9 at 40-42, 86-20.) The parties can be overhead discussing the

17   amount of money Munoz is owed and counting money. (ECF Nos. 86-9 at 42, 86-20.)

18        On November 13, 2020, Munoz voluntarily called UC-2 because CS-1 allegedly

19   told him UC-2 wanted to do a deal now and gave Munoz UC-2's phone number. (ECF

20   Nos. 69 at 12, 85 at 9, 86-21.) UC-2 indicated his interest in buying "ice" and "blues" that

21   Munoz sold him before (slang for methamphetamine and fentanyl), and Munoz invited

22   UC-2 to come talk to him or contact him when he was ready. (ECF Nos. 69 at 12-13, 86-

23   21.) Munoz confirmed his associate has everything UC-2 needed, that he can sell UC-2

24   the pills he sold him before, and discussed the pricing for the pills. (*Id*.) Munoz also

25   appears to invite UC-2 down to talk about CS-1. (ECF No. 86-21.) During a subsequent

26   phone conversation on November 19, 2020, Munoz offered to lower the price per pill if

27

28        [5]The Court notes that Munoz appears to be named in CS-1's phone as "Elchivo
     Thebarber." (ECF No. 86-16.)

1   UC-2 bought more pills. (ECF Nos. 85 at 9-10, 86-22.) The parties subsequently agreed

2   on a purchase price and time to meet for the drug sale. (*Id*.)

3       UC-2 and Munoz subsequently met at Munoz's barbershop that same day. (ECF

4   Nos. 85 at 10, 86-23.) During this recorded meeting, Munoz told UC-2 that he was asking

5   around about CS-1 because he heard CS-1 was caught with something in January, that

6   he was the only one "let go," and Munoz was worried CS-1 was "snitching" or he was

7   being set up. (*Id*.) Munoz told UC-2 that he had his friends check for cops. (*Id*.) Munoz

8   then gave UC-2 the fentanyl pills, confirmed these were the drugs he sold UC-2 last time,

9   described whether people like to smoke or sniff the specific pills, discussed whether

10  certain pills have more fentanyl than others, counted the money, and shared advice on

11  how to store/hide the drugs. (*Id*.) In a subsequent phone call on November 20, 2020,

12  Munoz revealed to UC-2 that he did not want CS-1 to be present during the drug

13  transactions, and then voluntarily offered to sell UC-2 more pills for a certain price. (ECF

14  Nos. 85 at 10, 86-24.) UC-2 responded that he would think about it, and Munoz said to

15  let him know, "the sooner the better." (*Id*.)

16      Munoz was indicted on March 25, 2021, on four counts of distribution of a

17  controlled substance (fentanyl) for the July 24, 2020, August 4, 2020, August 6, 2020,

18  and November 19, 2020, controlled drug purchases. (ECF No. 1.)

19  **III.   DISCUSSION**

20      When law enforcement officers' actions are "so outrageous that due process

21  principles would absolutely bar the government from invoking judicial processes to obtain

22  a conviction," courts must dismiss the indictment. *U.S. v. Russell*, 411 U.S. 423, 431-32

23  (1973). This remedy is "limited to extreme cases" in which government conduct "violates

24  fundamental fairness." *U.S. v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011).

25      "It is outrageous for government agents to (1) engineer and direct a criminal

26  enterprise from start to finish; (2) to use excessive physical or mental coercion to convince

27  an individual to commit a crime; or (3) to generate new crimes merely for the sake of

28  pressing criminal charges." *U.S. v. Pincombe*, Case No. 2:14-cr-00178-JAD-GWF, 2015

1   WL 8480079, at *5 (D. Nev. Nov. 3, 2015) (citing *U.S. v. Black*, 733 F.3d 294, 302 (9th

2   Cir. 2013)); *see also U.S. v. Stenberg*, 803 F.2d 422, 429 (9th Cir. 1986) ("Constitutionally

3   unacceptable conduct includes, but is not limited to, situations where law enforcement

4   agents employed unwarranted physical or mental coercion, where 'government agents

5   engineer and direct the criminal enterprise from start to finish,' and where the government

6   essentially manufactures new crimes in order to obtain the defendant's conviction.'")

7   (internal citations omitted). Because "[t]here is no bright line dictating when law

8   enforcement conduct crosses the line between acceptable and outrageous," each case

9   turns "'on its own particular facts.'" *Black*, 733 F.3d at 302 (internal citations omitted).

10          To help guide this circumstance-specific inquiry, the Court will consider six factors

11   set forth in *U.S. v. Black*, which include:

> (1) known criminal characteristics of the defendant;
> (2) individualized suspicion of the defendant;
> (3) the government's role in creating the crime of conviction;
> (4) the government's encouragement of the defendant to commit the offense conduct;
> (5) the nature of the government's participation in the offense conduct; and
> (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

17   733 F.3d at 303. The first three factors address the government's conduct when initiating

18   a sting, with factors four and five addressing the conduct of the government during the

19   operation. *See id.* at 304, 308. The final factor concerns the relationship between the type

20   of crime being investigated and whether the techniques used by the government were

21   necessary. *See id.* at 309. The facts of the case and surrounding circumstances must be

22   considered in their totality. *See id.* at 304 (noting the factors "do not constitute a formalistic

23   checklist," but rather help courts focus their analysis).

24          The Court finds that the *Black* factors weigh against dismissal, and explains its

25   reasoning below, first addressing what law enforcement knew about Munoz before

26   initiating the operation, then considering the government's role in creating the crime,

27   whether the government encouraged or pressured Munoz to commit the offense, and the

28

1    nature of the government's participation in the offense conduct. Finally, the Court weighs

2    the need for such tactics in prosecuting drug distribution/trafficking crimes.

3            **1.**     **Known Criminal Characteristics & Individualized Suspicion**

4        To start, Munoz argues he had no prior background that signaled any involvement

5    in drug trafficking/distribution or would give rise to individualized suspicion. (ECF No. 69

6    at 15-16.) The government argues there was individualized suspicion because CS-1

7    identified Munoz as a counterfeit oxycodone and cocaine distributor. (ECF No. 85 at 2,

8    15.) The Court agrees with the government.

9        Courts often consider the first two *Black* factors together, as they are "closely

10    related." *U.S. v. Snagglers*, Case No. 2:14-cr-00086-JCM-PAL, 2015 WL 10436117, at

11    *6 (D. Nev. Dec. 30, 2015). The first factor asks whether the government knew the

12    defendant had a criminal background or propensity "when it initiated its sting operation."

13    *Black*, 733 F.3d at 304. The second factor considers whether the government had reason

14    to connect the suspected individual (or group to which the individual belonged) with the

15    targeted offense under investigation. *See id.* Strictly speaking, law enforcement need not

16    have individualized suspicion of a defendant's wrongdoing before conducting an

17    undercover investigation. *See U.S. v. Luttrell*, 923 F.2d 764 (9th Cir. 1991) (en banc).

18    However, whether law enforcement had reason to suspect "an individual or an identifiable

19    group before initiating a sting operation is an important consideration." *Black*, 733 F.3d at

20    304.

21        Prior to the investigation, Munoz had a few misdemeanors for DUI and brandishing

22    a weapon from over a decade ago, but no felony convictions. (ECF Nos. 69 at 3, 85 at

23    16.) These misdemeanors, by themselves, may be insufficient to demonstrate a

24    propensity for drug distribution. However, law enforcement received a detailed tip in May

25    2020 from CS-1, who explicitly identified Munoz as a distributor of counterfeit oxycodone

26    M30 tablets and cocaine.[6] (ECF Nos. 69-1 at 2, 85 at 15.) CS-1 also revealed that Munoz

27

28        [6]The government seemingly references "highly suspicious behavior" by Munoz that occurred *after* the investigation began, including the June 3, 2020, meeting where CS-1

1   dealt drugs at his barbershop in Sparks and had witnessed Munoz in possession of up to

2   6,000 M30 pills at one time. (*Id.*) In *Black*, the Ninth Circuit declined to find outrageous

3   government conduct even when the government "troll[ed] for targets" in a "bad part of

4   town," and knew nothing about the defendants' criminal inclinations or history. 733 F.3d

5   at 303, 305. Here, there is no question that the government's knowledge of Munoz is

6   significantly more targeted and comprehensive than its knowledge of the defendants in

7   *Black*. The Court therefore finds that CS-1's tip, together with Munoz's criminal history,

8   created individualized suspicion of wrongdoing. However, even if the first two *Black*

9   factors present a close call, the other *Black* factors strongly weigh against dismissal.

10           **2.      Government's Role in Creating the Crime, Encouraging the Defendant, and Participating in the Offense Conduct**

11

12          The Court next considers the third, fourth, and fifth *Black* factors together because

13   they overlap. Munoz argues that the drug transactions would not have occurred without

14   CS-1, who was "off-leash" and "compromised" due to his own drug charges,[7] and who

15   initiated contact with Munoz and brokered the drug deals. (ECF No. 69 at 16-19.) The

16   government counters that law enforcement merely attached itself to an ongoing drug

17   trafficking business, that Munoz was not coerced because CS-1 "held no position of

18   authority" over him, and that the government was a passive participant because Munoz

19

20   allegedly paid Munoz a drug debt. (ECF No. 85 at 15.) For the purposes of the
     individualized suspicion analysis, the Court declines to consider these examples. *See*

21   *U.S. v. Pedrin*, 797 F.3d 792, 797 (9th Cir. 2015) ("What the government learns only after
     the fact cannot supply the individualized suspicion that is necessary to justify the sting if

22   the government had little or no basis for such individualized suspicion when it was setting
     up the sting").

23

24           [7]Munoz attacks CS-1's motives, credibility, and character, arguing that he was "off-
     leash" and participated in the sting for his own self-interest, as he was also facing drug

25   charges. (ECF Nos. 69 at 4-5, 16-17, 97 at 3.) However, these issues are irrelevant to the
     Court's analysis, as the Ninth Circuit has long held that "[g]overnmental use of informants

26   who previously engaged in wrongful or illegal activity does not constitute outrageous
     governmental conduct." *U.S. v. Bonanno*, 852 F.2d 434, 439 (9th Cir. 1988) (citation

27   omitted). Moreover, for the charged drug purchases in this case, DEA either directed CS-
     1 to reach out to Munoz, or Munoz voluntarily contacted CS-1 to sell him drugs, thereby

28   undermining Munoz's suggestion that CS-1 was "off-leash" or acted independently. (ECF
     Nos. 85 at 6-10, 86-9, 86-14, 86-15, 86-18, 86-19, 86-20.)

1   procured drugs from his own sources and voluntarily reached out to buyers. (ECF No. 85

2   at 17-26.) The Court agrees that these *Black* factors disfavor dismissal.

3          First, the government had a limited role in creating the crime. For this analysis, the

4   Court considers "whether the government approached the defendant initially or the

5   defendant approached a government agent, and whether the government proposed the

6   criminal enterprise or merely attached itself to one that was already established and

7   ongoing." *See Black*, 733 F.3d at 305 (citation omitted). Although there is no dispute that

8   CS-1 initially reached out to Munoz to buy pills, the evidence strongly suggests that

9   Munoz was already involved in the drug trade. (ECF No. 85 at 15.) Munoz repeatedly

10  references his existing contacts and associates, who can procure him significant

11  quantities of pills, and knew about the progress and timing of various drug shipments.

12  (ECF Nos. 86-12, 86-16, 86-21, 86-22.) Before the sting, CS-1 also disclosed to DEA

13  agents that Munoz was an active drug distributor. (ECF No. 69-1 at 2.) Finally, Munoz

14  exhibited extensive knowledge about the attributes, strength, and pricing of various pills,

15  which evidences his pre-existing participation in the drug trade. (ECF Nos. 86-18, 86-21,

16  86-22, 86-23.) *See id*.

17         Second, even if the evidence is insufficient to demonstrate Munoz's previous

18  involvement in the drug trade, Munoz was not pressured or coerced into selling drugs.

19  *See id.* at 308 (explaining that "[t]he extent to which the government encouraged a

20  defendant to participate in the charged conduct is important, with mere encouragement

21  being of lesser concern than pressure or coercion"). Before the drug transactions, CS-1

22  would set the "bait" by proposing a potential buyer and quantity of drugs to Munoz—which

23  is permissible under Ninth Circuit precedent. (ECF Nos. 86-12, 86-19, 86-21.) *See id*.;

24  *see also U.S. v. Dunlap*, 593 F. App'x 619, 621 (9th Cir. 2014); *U.S. v. Pickett*, 727 F.

25  App'x. 428, 429 (9th Cir. 2018). However, Munoz displayed no reluctance or hesitation

26  about selling the drugs and would eagerly accept CS-1's offer, requiring no further

27  encouragement or inducement from the government. (ECF Nos. 86-14, 86-15, 86-18, 86-

28  19, 86-20.) Hence, Munoz's response does not evince government coercion or pressure.

*See Black,* 733 F.3d at 308 (finding little evidence of coercion because "the defendants eagerly jumped at the opportunity" when the government "proposed the stash house robbery"); *see also Dunlap*, 593 F. App'x at 621 (finding the government's conduct "does not go beyond the bounds of what we found acceptable in *Black*" because "[o]nce the bait was set, [the] [d]efendants responded with enthusiasm") (citation and quotation marks omitted); *Pickett*, 727 F. App'x. at 429 (finding no evidence of government coercion because the government simply "proposed the [firearms sales], and the defendants eagerly jumped at the opportunity").

Notably, Munoz even reached out to CS-1 and UC-2 to offer to sell them drugs— sometimes in a quantity that was more than the requested amount. In a phone call on July 27, 2020, Munoz asked CS-1 if he needed any more drugs. (ECF No. 86-15.) On November 13, 2020, Munoz voluntarily called UC-2 and later sold him hundreds of pills at his barbershop, *without* CS-1 present, giving UC-2 a discount when he purchased more drugs from Munoz. (ECF Nos. 86-21, 86-22, 86-23.) Munoz, unprompted, called UC-2 again on November 20, 2020, and offered to sell him drugs. (ECF No. 86-24.) *See Pickett*, 727 F. App'x. at 429-30 (finding that "[a]ny concerns about the government's role in creating the crime were ameliorated by the defendants' unprompted and continuous offers to sell firearm . . .") (citation omitted).

Moreover, the government correctly notes that the relationship between CS-1 and Munoz was not of a coercive nature. (ECF No. 85 at 22.) The evidence shows a close friendship between the parties, with Munoz acknowledging that he "gave [CS-1] money on multiple occasions, went to the gym with him regularly, partied with him on weekends, shared relationship advices with him, and was legitimately concerned with his growing drug addiction and lack of employment." (ECF No. 97 at 2.) This relationship dynamic does not suggest that CS-1 held any power or authority over Munoz and pressured him into committing these crimes. *See U.S. v. Mayer*, 503 F.3d 740, 755 (9th Cir. 2007) (concluding that the investigation was within the bounds established by prior cases, in

1    part, because there was no evidence of any coercive relationship between the defendant

2    and the agent).

3         Third, the evidence shows limited government participation because Munoz had

4    the technical expertise and resources to commit the offense without government

5    intervention. *See Black*, 733 F.3d at 309 ("courts have examined the *necessity* of the

6    government's participation in the criminal enterprise—whether the defendants would have

7    had the technical expertise or resources necessary to commit such a crime without the

8    government's intervention"). Here, Munoz had his own contacts to supply him with large

9    quantities of drugs and a good grasp of the timing and progress of various drug

10   shipments. (ECF Nos. 86-12, 86-16, 86-21, 86-22.) He also possessed extensive

11   knowledge about the pills he sold. Munoz voluntarily offered information/advice about the

12   strength of different pills, whether they are snorted or smoked, which pills contained more

13   fentanyl, and how to properly store/hide the pills. (ECF Nos. 86-14, 86-23.) He knew about

14   the market value of the pills, and actively negotiated and set the price for them—even

15   offering UC-2 a discount if UC-2 bought more pills from him. (ECF Nos. 86-12, 86-18, 86-

16   21, 86-22.) This high level of expertise would be rare in a layperson or casual drug user.

17   *See Pickett*, 727 F. App'x. at 429 (finding that the individuals "had all the skills and

18   expertise necessary to conduct illegal firearm sales" because they had a "source of

19   firearms in Arizona and extensive knowledge about guns").

20        Additionally, Munoz helped engineer the drug transactions by planning the meeting

21   places, dates, and times for the drug sales, recruiting friends to check for police officers

22   before the drug transactions, and purposely excluding individuals he suspected of

23   "snitching." (ECF Nos. 86-15, 86-16, 86-21, 86-22, 86-23, 86-24.)  *See Dunlap*, 593 F.

24   App'x. at 621 (finding that the government's conduct was not outrageous because the

25   defendants planned the details of the robbery and provided the supplies to carry out the

26   robbery). Accordingly, the evidence supports a finding that once the government

27   presented Munoz with opportunities for the drug sales, the government had limited

28

10

1    involvement, and Munoz used his own technical expertise, connections, and resources

2    to commit the charged offenses.

3          Therefore, the Court finds that the third, fourth, and fifth *Black* factors weigh against

4    dismissal. Even without the government's involvement, the crime would have likely taken

5    place. After the government set the bait, Munoz eagerly accepted and seized the

6    opportunity without further inducement, coercion, or pressure. He helped plan and

7    negotiate the details of the drug transactions, including the purchase location, purchase

8    date/time, the quantity and price of the pills, and who would be present during the drug

9    transaction.[8]

10          **3.**     **Nature of the Crime Being Pursued and Necessity for Law Enforcement's Actions**

11

12          Finally, the Court considers the sixth *Black* factor and "the need for the

13    investigative technique that was used in light of the challenges of investigating and

14    prosecuting the type of crime being investigated." 733 F.3d at 309. Munoz is charged with

15    distributing fentanyl. (ECF No. 1.) The Court notes that fentanyl has had a particularly

16    devastating effect on the community and has claimed many lives. (ECF Nos. 69 at 19, 85

17    at 11.) In fact, two teenagers in the Reno area tragically died from fentanyl overdoses in

18    June 2020, around the time of the sting operation. (ECF No. 69 at 6.) The Court finds that

19    drug trafficking and distribution are uniquely hard to police, and that apprehending

20    suspects is difficult without the use of undercover agents and confidential informants like

21    CS-1, with inside knowledge and pre-existing connections to drug dealers. Sting

22    operations and controlled drug purchases, like the ones in this case, are often required

23    to effectively uncover individuals who are selling deadly drugs like fentanyl. Thus, the

24    sixth factor strongly weighs against dismissal.

25

26

27

28

---

[8]The Court declines to address Munoz's argument that the wiretaps are evidence of outrageous government conduct. In his motion, Munoz confirmed that "[n]othing from the wiretaps led to any charges" in this specific case, and the government has already repeatedly reassured Munoz that it will not introduce wiretap evidence at Munoz's trial, except as impeachment evidence if Munoz testifies. (ECF Nos. 69 at 19, 85 at 11.)

In sum, the Court finds that the government's conduct in this case did not exceed the bounds of what the Ninth Circuit found acceptable in *Black*, and Munoz failed to meet the "extremely high standard" for dismissal on the grounds of outrageous government conduct. *See id*. at 302.

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motion before the Court.

It is therefore ordered that Munoz's motion to dismiss (ECF No. 69) the indictment is denied.

DATED THIS 8th Day of September 2022.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE